**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**
*Southern Division*

| | |
|---|---|
| **M.L.** *ex rel*. **AKIVA LEIMAN**, *et al.*, | * |
|   PLAINTIFFS, | * |
| v. | *   Case No.: PWG-14-1679 |
| **JOSHUA P. STARR**, *et al.*, | * |
|   DEFENDANTS. | * |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**MEMORANDUM OPINION AND ORDER**

Rabbi Akiva Leiman and Shani Leiman ("Parents") and their minor son, M.L. ("Student"), by and through his Parents, filed suit against Joshua Starr in his official capacity as Superintendent of Montgomery County Public Schools ("MCPS") and Montgomery County Board of Education ("the Board"), claiming that Defendants failed to provide the Student, who has an intellectual disability, "with the Free Appropriate Public Education ('FAPE') to which he is entitled under the Individuals with Disabilities Education Improvement Act ('IDEA'), 20 U.S.C. §§1400 *et seq.*" Compl. ¶¶ 1, 9, ECF No. 1.  Specifically, they allege that Defendants "fail[ed] to propose an appropriate educational program or placement for M.L. that takes into account his religious and cultural needs." *Id.* ¶ 70. They also claim that the administrative law judge ("ALJ") who reviewed the Student's individualized education program ("IEP") erred in "failing to render a proper decision based on an accurate and impartial understanding of the facts and law" and consequently "unreasonably concluded that the school system had proposed an educational program and placement for M.L. that was reasonably calculated to provide him with a FAPE for the 2012-13 school year," and "incorrectly denied the parents their requested relief of

funding and an appropriate placement at the Sulam School ('Sulam')."[1] *Id.* ¶¶ 1, 74. Sulam, the school the Student currently attends at his Parents' expense, "is a full-time special education program serving the Orthodox Jewish population"; there, the Student participates in a "program . . . to prepare students to live independently in their Orthodox Jewish community." *Id.* ¶¶ 6, 22–24. Because, giving due weight to the ALJ's factual findings and from my own *de novo* review of the entire record, I conclude that Plaintiffs are not entitled to judgment as a matter of law and Defendants are, I will deny Plaintiffs' Motion for Summary Judgment, grant Defendants' Cross-Motion for Summary Judgment, and close this case.[2]

## I. FREE APPROPRIATE PUBLIC EDUCATION

Children with disabilities are entitled to a free appropriate public education, or "FAPE," pursuant to the IDEA. 20 U.S.C. § 1412(a)(1)(A). Maryland regulations also "govern[] the provision of FAPEs to children with disabilities in accordance with the IDEA." *M.C. v. Starr*, No. DKC-13-3617, 2014 WL 7404576, at *1 (D. Md. Dec. 29, 2014) (citing Md. Code Regs. Tit. 13A, § 05.01). A FAPE is an education that provides "meaningful access to the educational process" in "the least restrictive environment" and is "reasonably calculated to confer 'some educational benefit'" on the child with a disability. *Id.* (citing *Bd. of Educ. of the Henrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 192, 207 (1982)). "The benefit conferred . . . must amount to more than trivial progress," but "[t]he IDEA does not require that a school district provide a disabled child with the best possible education . . . ." *Id.* (citing *Rowley*, 458 U.S. at 192; *Reusch v. Fountain*, 872 F. Supp. 1421, 1425 (D. Md. 1994)).

---

[1] Plaintiffs requested that MCPS "fund the secular portion of [the Student's] school day" at Sulam. Compl. ¶ 49.

[2] The parties have fully briefed cross-motions for summary judgment. ECF Nos. 12, 12-1, 13, 13-1, 14, 15. A hearing is not necessary. *See* Loc. R. 105.6.

To this end, each child with a disability must have "an appropriate Individualized Education Program ('IEP')" that "state[s] the student's current educational status, annual goals for the student's education, which special educational services and other aids will be provided to the child to meet those goals, and the extent to which the child will be 'mainstreamed,' i.e., spend time in regular school classroom with non-disabled students." *Id.* (citing 20 U.S.C. § 1414(d)(1)(A)). In Maryland, parents may voice disagreement with their children's proposed IEPs and request due process hearings before the Maryland Office of Administrative Hearings to address their concerns. *See id.* at *2 (citing 20 U.S.C. § 1415(b)(6), (f); Md. Code Ann., Educ. § 8–413; Md. Code Regs. Tit. 13A, § 05.01.15(C)(1)). "Any party can then appeal the administrative ruling in federal or state court." *Id.* (citing Educ. § 8–413(h)). Additionally, parents may place their children in private school that is "appropriate to meet the child's needs" and "seek tuition reimbursement from the state," but only if "if the court or hearing officer finds that the agency had not made a free appropriate public education available to the child in a timely manner prior to that enrollment.'" *Id.* (quoting Title 20 § 1412(a)(1)(C)(iii); citing *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 369–70 (1985)).

## II.   BACKGROUND[3]

The material facts are undisputed.[4] The Student has an intellectual disability, and his "full scale IQ" was determined in 2009 and again in 2012 to be in the first percentile. Compl.

---

[3] In reviewing a motion for summary judgment, the Court considers the facts in the light most favorable to the nonmovant, drawing all justifiable inferences in that party's favor. *Ricci v. DeStefano*, 557 U.S. 557, 585–86 (2009); *George & Co., LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 391–92 (4th Cir. 2009). Where, as here, the Court is presented with cross-motions for summary judgment, the facts relevant to each motion must be considered in the light most favorable to the nonmovant. *Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003). Unless otherwise stated, this background is composed of undisputed facts. *See Ricci*, 557 U.S. at 585–86; *George & Co.*, 575 F.3d at 391–92.

¶¶ 9, 18, 30; Defs.' Mem. 3. Therefore, he is entitled to a FAPE under the IDEA. Compl. ¶ 1; Defs.' Mem. 3. His instruction must be consistent and repetitive for him to learn. Pls.' Mem. 4, 8; Defs.' Mem. 3.

The Student is a part of the Orthodox Jewish community in which he lives, and it is very important to his Parents that he learn the rules and customs of Orthodox Jewish life. Compl. ¶ 8; Defs.' Mem. 3–4. In their view, "he has many important religious and cultural needs that must be taken into account when designing an appropriate learning environment for him," and his "functional life skills are different than those of a non-Orthodox student." Compl. ¶¶ 8, 41. Therefore, they sought an IEP for the 2012–2013 school year that provided for the Student to be placed at Sulam, where the basics of Orthodox Jewish life are a part of the curriculum. Compl. ¶ 49; Defs.' Mem. 4, 14 n.7. Instead, MCPS proposed an IEP that placed the Student at Woodlin Elementary School, a MCPS public school, and did not include instruction for the Student on rules and customs of the Orthodox Jewish community. Compl. ¶¶ 46–47, 50, 58, 60; Defs.' Mem. 4.

In response, the Parents "filed a due process hearing request on July 26, 2013, seeking reimbursement and placement for M.L. at Sulam." Compl. ¶ 52; Defs.' Mem. 4. During the five-day hearing, the ALJ heard testimony from the Parents' six witnesses (the Student's father, an expert in Judaism, experts in special education, the Assistant Director/Director of Advocacy at the Weinfeld Education Group, and an expert in the teaching and supervision of special education in a Jewish day school) and MCPS's three witnesses (an expert in psychology and two experts in special education, one with "an emphasis on culturally and linguistically diverse students with disabilities"). Compl. ¶¶ 53–55; ALJ Dec. 5–6. He also received 56 exhibits from

---

[4] Although Plaintiffs dispute which facts are material, as discussed below, the facts presented here are not disputed.

the Parents, 22 from the Board, and 4 from the Office of Administrative Hearings; the exhibits included assessments, reports, evaluations, the IEP, school report cards and updates, correspondence, witness resumes, and the Common Core Curriculum that MCPS follow. ALJ Dec. 5–6.

Insisting that the Student "is not capable of generalizing what he learns at school to home and vice-versa" and therefore "needs the same information taught in [both] settings," the Parents argued that "'It is clear that the school system's proposed IEP cannot prepare [the Student] for life in his Orthodox Jewish community, rendering it inappropriate,'" and that "'MCPS has just refused to consider adding instruction that will prepare [the Student] for an Orthodox Jewish way of life, and that violates his right to a FAPE.'" ALJ Dec. 15, 25, Admin. Rec., ECF No. 3 (quoting Parents' Rebuttal Closing 11). They noted that "'the school system's witnesses . . . repeatedly testified that they would not personalize [the Student's] IEP to meet his unique needs or include any of the bilingual or bicultural education he needs to be part of his community.'" *Id.* (quoting Parents' Written Closing ("PWC") 16). As the Parents see it, Hebrew literacy, identification of Kosher symbols, and "time recognition" tailored to abiding by Kosher rules in separating the consumption of meat and dairy are "functional and/or academic skills that [the Student] needs in his community and in his culture" and that must be included in his IEP. *Id.* at 25–26 (quoting PWC 19–20).

The ALJ made the following findings of fact:

1. The Student was born on March 31, 2003. He lives with the Parents and nine siblings in Montgomery County, Maryland. The family is part of the Orthodox Jewish community. All the school-age children attend private Jewish schools.

2. The way of life of an Orthodox Jew is much different from that of the general population. The Jewish Bible and Jewish law and custom govern how an Orthodox Jew dresses, eats, prays, works, what holidays are celebrated, and

5

almost every aspect of life, including social interaction and understanding and speaking Hebrew.

3. The Student was diagnosed with Down Syndrome at birth. He is eligible for special education services under federal and State law as a child with an intellectual disability. For some period of time, but only before kindergarten, the Student received special education services from MCPS. Since September 2009, he has attended Sulam, a special education program that serves the Orthodox Jewish community and is located inside the Melvin J. Berman Hebrew Academy.

4. Beginning on June 6, 2012, the parties met to discuss an IEP for the Student for his education during the 2012-2013 school year in the MCPS. The purpose of the initial meeting in June 2012 was to reevaluate the Student's current levels of academic achievement and educational performance. The parties agreed at this meeting to obtain updated assessments of the Student in education, speech and language pathology, and psychology.

5. The parties next met on September 5, 2012, and reviewed the results from some of the assessments. They agreed that intellectual disability was the Student's correct diagnosis and that an IEP should include goals in academics and social-adaptive skills. At this meeting, the parties agreed to obtain an occupational therapy (OT) assessment.

6. On June 20, 2012, Dr. Foster conducted a psychological assessment of the Student. It showed significantly below average scores in all areas of cognitive functioning. Most of the Student's test scores were at or below the first percentile. This assessment was essentially the same as an assessment done by Dr. Foster on March 30, 2009.

7. The Student's most recent educational assessments in February-March 2009 and July-August 2012 showed significantly below average performance in all academic areas in 2009 and weaknesses in all areas in 2012 on an instrument designed to test children functioning below the developmental age of 7. In all the academic and visual-motor areas, his scores in 2012 were aligned with children of kindergarten age, with some below and some at the first-grade level.

8. The Student is able to learn despite his severe intellectual disability, but he needs constant repetition and consistency.

9. On December 5, 2012, the parties met for a third time at an IEP team meeting. They reviewed the results of the assessments done by the speech and language pathologist and the occupational therapist (OT). The speech and language pathologist reported weaknesses in expressive grammar, vocabulary, syntax, and reported speech and language difficulties in practical environments. The OT reported decreased muscle tone and strength that impacted the Student's ability to manage classroom materials and personal belongings. At this meeting, the parties began to develop an IEP, but did not complete it.

10. The final IEP meeting was on January 9, 2013. A proposed IEP was completed, but it was rejected by the Parents. The Parents rejected the IEP because it does not provide functional instruction to prepare the Student for life in

the Orthodox Jewish community. The Parents requested at the IEP meetings incorporation of goals and objectives designed to teach the Student about the laws and customs of Orthodox Judaism. This was rejected by the MCPS as not part of the curriculum, too specific, religious, or not compatible with the Student's present levels.

11. The proposed IEP includes a description of the Student's present levels of academic achievement and functional performance across the standard range of academic areas; goals and objectives in sixteen separate practical and functional areas; and the provision of special education services for twenty-eight hours and forty-five minutes per week, occupational therapy for one hour per week, and speech and language therapy for one hour per week, with four hours and fifteen minutes per week of exposure to non-disabled peers. The Student's placement was in the fundamental life skills curriculum in a self-contained classroom at Woodlin Elementary School.

12. On July 26, 2013, the Parents filed a request for a due process hearing with the MCPS.

The ALJ acknowledged that the "proposed IED for the 2012-2013 school year does not provide an education program that teaches the Student the ways of the Orthodox Jewish community," but he found that "the IDEA, and corresponding State law, imposes no . . . obligation on the MCPS" to prepare the Student " 'for life in his Orthodox Jewish community."

ALJ Dec. 26.  The ALJ reasoned:

> Congress enacted the IDEA to require states to make public education available to disabled children. Nothing in the IDEA, corresponding State law, or enabling regulations require a state educational agency to individualize an educational program to a disabled child's religion, culture, or community enclave. This was essentially Ms. Browne's[5] testimony when she was asked to explain why MCPS did not include religious or cultural goals and instruction in the IEP. She testified that "specially designed instruction" is "strategy," "instruction," "related services," and "specific" reading or math "interventions ... that meet the needs of a student's educational disability in order that they can access and make progress in the general curriculum as defined by the school system area, the local education agency." Tr. 799

ALJ Dec. 29.  Noting that "Subsection 1414(d) of the IDEA addresses IEPs and makes clear that the goals and objectives in an IEP are 'designed to ... meet the child's needs that result from the

---

[5] "Brenda Browne, Instructional Specialist in Special Education for the MCPS, accepted as an expert in special education with an emphasis on culturally and linguistically diverse students with disabilities," testified for MCPS.  ALJ Dec. 6.

7

child's disability to enable the child to be involved in and make progress in the *general educational curriculum*,'" the ALJ concluded that "Congress enacted the IDEA to require local educational agencies to provide disabled children *access to the public school curriculum*, not, as the Parents here argue, . . .access [to] his Orthodox Jewish community." *Id.* (emphases added). He found that the "'I' in 'IEP,'" which the Parents insisted meant that MCPS must "provide the Student 'necessary help in accessing whatever **his curriculum** might be,'" actually meant that "the local agency must use special education and related services that are intended to provide disabled children meaningful access to *the general curriculum*, despite the child's disabling conditions." *Id.* at 28–30 (quoting PWC 23 (bold emphasis in PWC, italicized emphasis added)).

The ALJ observed that "two of the Parents' witnesses who testified as experts in special education agreed that the IEP would be appropriate for the Student if he were not being reared as an Orthodox Jew," and "Rabbi Leiman agreed that MCPA's proposed IEP's goals and objective would meet the Student's secular needs," although he later testified to the contrary that "the IEP would not meet the Student's secular needs 'because his secular needs include making him as a person and fitting into his cultural milieu,'" and Rabbi Leiman agreed that, "but for the Student's cultural needs, his placement at Woodlin would meet his special and general educational needs." ALJ Dec. 32–33.

The ALJ concluded that "[t]he absence of goals and objectives expressly related to Orthodox Judaism does not render the Student's educational program inappropriate." ALJ Dec. 33. The ALJ found that "[t]he Student's IEP [was] reasonably calculated to provide him with some educational benefit because it adequately addresses the Student's disability-based impediments to learning and appropriately provides for special education and related services that reasonably should enable him to benefit from the MCPS' curriculum," such that "the IEP

and placement proposed by MCPS for the 2012–2013 school year [were] reasonably calculated to offer the Student a FAPE." *Id.*  He denied "the Parents' request for a declaration that Sulam is the proper educational placement for the Student and for reimbursement for the costs of the Student's attendance at Sulam for the 2012–2013 school year." ALJ Dec. 34.  Dissatisfied, Plaintiffs filed suit in this Court, and the parties filed the pending summary judgment motions.

### III.    STANDARD OF REVIEW

In reviewing cross-motions for summary judgment in an IDEA action, the "'reviewing court is obliged to conduct a modified *de novo* review'" of the administrative record, "'giving "due weight" to the underlying administrative proceedings.'" *M.C. v. Starr*, No. DKC-13-3617, 2014 WL 7404576, at *6 (D. Md. Dec. 29, 2014) (quoting *MM ex rel. DM v. Sch. Dist. of Greenville Cnty.*, 303 F.3d 523, 530–31 (4th Cir. 2002) (citing *Bd. of Educ. v. Rowley*, 458 U.S. 176 (1982)).  This means that when an ALJ makes findings of fact "in a regular manner and with evidentiary support," those findings "are entitled to be considered *prima facie* correct," and "the district court, if it is not going to follow them, is required to explain why it does not." *Doyle v. Arlington Cnty. Sch. Bd.*, 953 F.2d 100, 105 (4th Cir. 1991); *see M.C.*, 2014 WL 7404576, at *6–7.  The Court then reaches its decision based on the preponderance of the evidence. *Bd. of Educ. of the Henrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 192, 207 (1982).  Yet, the Court cannot ""'substitute [its] own notions of sound educational policy for those of local school authorities.'"" *M.C.*, 2014 WL 7404576, at *6–7 (quoting *MM*, 303 F.3d at 530–31 (quoting *Hartmann v. Loudoun Cnty. Bd. of Educ.*, 118 F.3d 996, 999 (4th Cir. 1997)). The burden of proof is on Plaintiffs as the party seeking relief. *See Barnett v. Fairfax Co. Sch. Bd.*, 927 F.2d 146, 152 (4th Cir. 1991), *cert. denied*, 502 U.S. 859 (1991).

"This standard works in tandem with the general standard of review for summary judgment, which also applies in IDEA cases . . . ." *M.C.*, 2014 WL 7404576, at *7. Thus, summary judgment is proper when the moving party demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c)(1)(A); *see Baldwin v. City of Greensboro*, 714 F.3d 828, 833 (4th Cir. 2013). If the party seeking summary judgment demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to identify evidence that shows that a genuine dispute exists as to material facts. *See Celotex v. Catrett*, 477 U.S. 317 (1986). When considering cross-motions for summary judgment, "the court must view each motion in a light most favorable to the non-movant." *Linzer v. Sebelius*, No. AW-07-597, 2009 WL 2778269, at *4 (D. Md. Aug. 28, 2009); *see Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003).

## IV.   DISCUSSION

To obtain court-ordered reimbursement for the secular portion of the Student's education, Plaintiffs first must demonstrate that "the public school system failed to provide a free appropriate public education." *Carter ex rel. Carter v. Florence Cnty. Sch. Dist. Four*, 950 F.2d 156, 161 (4th Cir. 1991) (stating that the second element to prove is that "the private school chosen by the parents did provide an appropriate education to the child").

Preliminarily, I must determine the weight to give the ALJ's findings of facts. *See Doyle v. Arlington Cnty. Sch. Bd.*, 953 F.2d 100, 105 (4th Cir. 1991). According to Plaintiffs, the ALJ's findings of fact were not "regularly made" and were not entitled to a presumption of

correctness, because he "consistently disregarded substantial, relevant, and reliable written evidence as well as expert opinions." Pls.' Mem. 12, 13, 14. Specifically, they insist that, "[e]ven though M.L.'s inability to generalize is essential to his educational programming, the ALJ made no finding whatsoever on this critical point." *Id.* at 18.

While it is true that the ALJ did not mention the Student's generalization skills in his findings of fact, the ALJ did not disregard the evidence about his ability to generalize. Rather, he observed:

> The parties disagree about whether the Student can generalize what he learns from one setting to a different setting. The Parents' witnesses do not think he can. Mr. Weinfeld testified that the Student "needs consistency between home and school" and "needs to be part of a group where it's consistent, where other kids are doing the same things where it's the same thing that's done at home and in school, so, it's all -- all part of one structured, consistent package." Tr. 224. Ms. Resti testified that "once [the Student] has a skill, it's critical that it be developed in a variety of areas across a variety of settings." Tr. 365. Dr. Foster, on the other hand, testified that the Student "can generalize," although "it might take him longer." Tr. 544

ALJ Dec. 17. Thus, the absence of any reference to the Student's generalization skills from the ALJ's factual findings is not a basis for concluding that the ALJ disregarded evidence, when the ALJ's evaluation of the evidence produced during the extensive hearing clearly demonstrates that he did not disregard evidence regarding the Student's ability to generalize what he learns at school to non-school settings. Rather, it appears that the ALJ considered the evidence and concluded, as I independently conclude below, that it was not relevant to his findings of fact.

As for the perceived shortcomings of the IEP and Defendants' alleged failure to provide a FAPE, Plaintiffs insist that the problem is not "the school system's failure to teach M.L. how to be a member of his Orthodox Jewish Community during the school day." Pls.' Mem. 23. In their view, the underlying IDEA violation is that Defendants did not "support [the Student's] access to the general education curriculum," which "required accommodation of his religious and cultural

practices" because of the Student's "unique disability profile and his membership in the Orthodox community." *Id.* They argue:

> [T]he MCPS IEP is inappropriate because it does not afford M.L. access to the general education curriculum while maintaining his ability to become a member of his religious and cultural community. The failure of the MCPS IEP has thus not been that it neglected to teach M.L. to be Jewish, but that it failed to permit him to access the general education curriculum areas, such as telling time, reading symbols, and learning how to provide food for himself, whilst still remaining a part of his community.

*Id.* at 27–28. They also contend specifically that the Student would not receive a FAPE under the IEP because the IEP did not provide for the Student to learn Hebrew. *Id.* at 21. Notably, beyond the alleged problematic interplay between the IEP and the Student's role in his Orthodox community, including the ALJ's failure to account for the Student's inability to generalize and the consequent (in Plaintiffs' view) failure to place the Student at Sulam, Plaintiffs do not identify any faults in the IEP or the ALJ's review of it.

Try as the Plaintiffs do to distinguish their misgivings with the IEP from its failure to provide for instruction geared to the Student's religious and cultural identity as an Orthodox Jew, that is the crux of this dispute:  Is the education proposed in the IEP a FAPE when it does not account for the Student's individual religious and cultural needs?  The short answer is yes. Simply put, a FAPE, to which a child with a disability is entitled, is the education that any student without disabilities would receive.  *See D.L. ex rel. K.L. v. Balt. Bd. of Sch. Comm'rs*, 706 F.3d 256, 260–61 (4th Cir. 2013) ("Public schools are only required to make a FAPE available on equal terms to all eligible children within their district."). The IEP is "individualized" or "personalized" to ensure that a child can access that education, considering his or her individual or personal cognitive and developmental capabilities and needs.  In this regard, Plaintiffs have pointed to no authority, nor have I found any, that expands the

requirement of the IDEA that an IEP be "individualized" to the extent that it affords a qualified student with an educational program specifically tailored to the religious and cultural enclave in which the student lives. *See Rowley*, 458 U.S. at 193 n.15 (noting that instruction is individualized when it is "'appropriate to [the student's] learning capacities'" (citation omitted)); *Hanson ex rel. Hanson v. Smith*, 212 F. Supp. 2d 474, 482 (D. Md. 2002). Rather, "the intent of the [IDEA] was more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside." *Rowley*, 458 U.S. at 192; *Hanson*, 212 F. Supp. 2d at 482 (same). "'[T]he "basic floor of opportunity" provided by the Act consists of access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child.'" *Hanson*, 212 F. Supp. 2d at 482 (quoting *Rowley*, 458 U.S. at 201). Thus, the IDEA does not require an IEP to be individualized to ensure that the child can access a personalized curriculum based on that child's cultural and religious circumstances or parents' beliefs. *See Rowley,* 458 U.S. at 193 n. 15; *Hanson*, 212 F. Supp. 2d at 482. Therefore, the IEP's admitted failure to include instruction addressing the Student's religious and cultural needs and MCPS's failure to place him in a private school that would account for those needs did not deprive him of a FAPE when, based on the record before the ALJ and independently reviewed by me, the IEP that MCPS proposed did confer educational benefit to the Student as required by the IDEA.

This is because "[a]ll that is required [by the IDEA] is that the disabled child benefit educationally from the program." *Hanson*, 212 F. Supp. 2d at 488. Plaintiffs have not shown that, due to the IEP's failure to include the religious and cultural instruction they sought, the Student would not have benefitted educationally from following the IEP or that it affected his access to a FAPE. "[T]he insistence of parents that a non-public school setting is more

13

appropriate does not establish the inappropriateness of the public school, even if the child would have benefitted more in the private setting." *Id.*  And, because the IEP did not need to account for the Student's religious or cultural needs, whether the Student could generalize the skills he learned in public school to life within his Orthodox Jewish community, that is, whether his public school education complemented the instruction he needed to live as an Orthodox Jew, is not determinative of whether the IEP provided the Student with a FAPE.  As the ALJ explained in his well-reasoned decision, the IEP and the Student's proposed placement in public school were reasonably calculated to provide him with a FAPE for the 2012-13 school year.  Indeed, aside from its lack of provisions for the Student's religious and cultural needs (which Plaintiffs see as indivisible from the whole), this fact is uncontested.

Plaintiffs also argue that funding the secular portion of the Student's education at Sulam would not violate the Establishment Clause.  Pls.' Mem. 31.  I need not reach this issue, as Defendants can provide the Student with a FAPE without placing him at Sulam, as outlined in the IEP.  *See Carter*, 950 F.2d at 161; *In re Under Seal*, 749 F.3d 276, 293 (4th Cir. 2014) ("'The principle of constitutional avoidance ... requires the federal courts to avoid rendering constitutional rulings unless absolutely necessary.'" (quoting *Norfolk S. Ry. v. City of Alexandria,* 608 F.3d 150, 157 (4th Cir. 2010))).  Thus, neither *Zobrest v. Catalina Foothills School District*, 509 U.S. 1 (1993), nor *Agostini v. Felton*, 521 U.S. 203, 234-35 (1997), two Establishment Clause cases on which Plaintiffs rely, is apposite. In *Zobrest*, the Supreme Court concluded that the provision of a sign language interpreter for a student attending a Catholic school did not violate the Establishment Clause of the First Amendment of the United States Constitution. 509 U.S. at 3, 13–14.  Not only the issue but also the circumstances were different because, there, the school district was obligated to provide a sign language interpreter, an

expense beyond the standard curriculum, and it was only a question of whether the interpreter provided services at the Catholic school or at a public school. *Id.* at 10–11. The partial funding of the student's education at a religious school was not at issue. *See id.* Moreover, the Supreme Court did not consider whether the student was receiving a FAPE. *See id.* Likewise, in *Agostini v. Felton*, 521 U.S. 203, 234-35 (1997), the Supreme Court considered whether New York's Title I instruction program could be offered in parochial schools. As in *Zobrest* but unlike here, Title I instruction was "aid [that was] provided to students at whatever school they cho[]se to attend" and that was "supplemental to the regular curriculum." *Id*. at 228. The Supreme Court held that "a federally funded program providing supplemental, remedial instruction to disadvantaged children on a neutral basis is not invalid under the Establishment Clause when such instruction is given on the premises of sectarian schools by government employees pursuant to a program containing safeguards such as [the payment of funds through a public agency, rather than directly to the religious school, and the use of selection criteria for Title I programs that did not consider the secular or sectarian nature of the school]." *Id.* at 234–35. Again, the Court did not consider whether the students received FAPEs. *See id.*

Plaintiffs have not shown that "the public school system failed to provide a free appropriate public education." *See Carter*, 950 F.2d at 161. Therefore, Plaintiffs' are not entitled to judgment as a matter of law, whereas Defendants are.

## **ORDER**

Accordingly, it is, this 3rd day of August, 2015, hereby ORDERED that

1. Plaintiffs' Motion for Summary Judgment, ECF No. 12, IS DENIED;

2. Defendants' Motion for Summary Judgment, ECF No. 13, IS GRANTED; and

3. The Clerk IS DIRECTED to CLOSE THIS CASE.

/S/
Paul W. Grimm
United States District Judge

lyb